JOSEPH R. BENFANTE, P.C.
ATTORNEY AT LAW
225 BROADWAY, SUITE 2700
NEW YORK, NEW YORK 10007
WWW.BENFANTELAW.COM

JOSEPH R. BENFANTE

———

JON L. NORINSBERG
OF COUNSEL

TELEPHONE: (212) 227-4700

———

FACSIMILE: (212) 406-6890

**May 13, 2011**

**VIA ECF & FEDERAL EXPRESS**
**Honorable Nicholas G. Garaufis**
**United States District Court**
**Eastern District of New York**
**225 Cadman Plaza East**
**Brooklyn, New York 11201**

> Re:  **United States v. Richard Lotito**
> **Docket Number 09-CR-672(S-1)-06**

Dear Judge Garaufis:

Please accept this letter memorandum submitted on behalf of my client, Richard Lotito, who is scheduled for sentencing before Your Honor, on Wednesday, September 21, 2011 at 12:00 Noon.

I.

**INTRODUCTION**

For reasons more specifically addressed herein, it is respectfully requested that Richard Lotito receive a non-guideline, non-incarceratory sentence, of house arrest and/or probation - as supported by the factors delineated in Title 18 § 3553(a) - the Supreme Court's decision in **Gall v. United States**, 552 U.S. 38, 128 S.Ct. 586 U.S. 2007 and/or by virtue of a downward departure, based on Richard Lotito's "extraordinary physical condition," pursuant to United States Sentencing Guideline, Section 5H1.4.

JOSEPH R. BENFANTE

## II.

## SUPREME COURT DECISION IN GALL V. UNITED STATES

As this Court is well aware, the Supreme Court has recently re-affirmed that the sentencing guidelines are advisory and are not presumed to be reasonable. In Gall v. United States, 552 U.S. 38, 128 S.Ct. 586 U.S. 2007, the Supreme Court rejected the notion that a sentence outside the guideline range must be supported by justification that is "proportional to the extent of the difference between the advisory range and the sentence imposed" and must be supported by extraordinary circumstances. See id. at 6.

Rather, the district court should correctly calculate the applicable guidelines range as the "starting point and the initial benchmark." See id. at 7. However, the guidelines are not the only consideration and the district court may not presume that the guideline range is reasonable. See id. After considering the factors listed in 3553(a), the court must make an "individualized assessment based on the facts present." See id. If a non-guideline sentence is appropriate, the extent of the deviation must be explained on the record. See id.

Regardless of whether the sentence imposed is inside or outside the guidelines range, the appellate court must review the sentence under an abuse of discretion standard. See id.

JOSEPH R. BENFANTE

### III.

**THE PLEA AGREEMENT AND THE PRESENTENCE INVESTIGATION REPORT ARE IN AGREEMENT WITH REGARD TO THE GUIDELINE CALCULATION**

On January 19, 2011, Richard Lotito appeared before Your Honor and entered a plea of guilty to Count Five, in accordance with his plea agreement.

The Plea Agreement calculated an adjusted offense level of 19, carrying a range of from 30 to 37 months. A copy of Richard Lotito's Plea Agreement is hereby annexed hereto and marked Exhibit "A" for the Court's perusal.

Pages 28 and 29, paragraphs 82 through 90 of the PSI Report, dated March 28, 2011 reiterates the computation analysis as depicted in the defendant's Plea Agreement. Richard Lotito has no criminal history points.

### IV.

**THE DEFENDANT RICHARD LOTITO'S PLEA ALLOCUTION MAKES CLEAR THAT RICHARD LOTITO AT NO TIME EVER THREATENED OR IN ANY WAY CAUSED IMPROPER PHYSICAL CONTACT TO THE BORROWER**

Richard Lotito's plea allocution on the date of the plea stated as follows:

"From on or about the summer of 2006, intermittently – on and off – through May 2009 – I and others collected money representing the repayment of various loans from an individual by the name of George Harrison.

3

JOSEPH R. BENFANTE

It was my understanding that Mr. Harrison knew that if the loans were not repaid, that the use of force might be employed to obtain said money.

I knowingly and intentionally participated in these collections knowing that this was illegal.

These collections took place on Stated Island, whereby Mr. Harrison would routinely drop money off at my place of business.

<u>However, at no time did I personally ever threaten Mr. Harrison, or in any way employ physical force or violence upon Mr. Harrison, during this entire time period.</u>" (emphasis supplied)

V.

### PRIOR TO THE INSTANT OFFENSE, RICHARD LOTITO HAD NEVER BEEN ARRESTED OR CONVICTED OF A CRIME

Prior to the instant offense, Richard Lotito had never been arrested or convicted of a crime and enjoyed an unblemished record. It is also noteworthy that Richard Lotito was not charged with RICO, nor was he listed as an "associate" in the indictment itself. See page 6, paragraph 19 of Indictment.

JOSEPH R. BENFANTE

## VI.

### PERSONAL BACKGROUND AND FAMILY HISTORY OF RICHARD LOTITO

It is respectfully requested that this Court consider, in accordance with 18 USC §3553(a), Richard Lotito's history and characteristics, which is outlined below, when determining an appropriate sentence.

Richard Lotito is currently 48 years of age born on July 2, 1963, in Brooklyn, New York. He is the oldest of three children born to the marital union of Richard Lotito and Frances (nee Langella) Lotito. The defendant's mother is deceased, having passed away in 2004 at the age of 59 from complications during a bout of pneumonia. She had suffered for many years from emphysema.

The loss of Mr. Lotito's mother was devastating to him, as he had always maintained a very close and loving relationship with her. When describing his mother, Mr. Lotito becomes emotional using words such as "amazing," "loving" and "extremely supportive." He further described her as "his best friend."

His father, who is almost 70 years of age, had been employed as an iron worker in the past. When the defendant was ten years old, his father fell from a six-story building. He was hospitalized for a series of surgical procedures, wherein metal plates were implanted in his arm and back. In addition, several years ago, Mr. Lotito's father suffered a heart attack, for which he still obtains medical treatment for, as well as suffering from Type II Diabetes. Richard attends to his father's varied needs and steadfastly takes his father to his medical appointments and other necessary supportive requirements.

The defendant has two siblings, a brother Thomas Robert Lotito (age 46), a New York City bus driver, who is married with three children. His sister Michelle Marie

5

JOSEPH R. BENFANTE

Lotito (age 44), is single with no children, and works as a hairdresser.  Mr. Lotito shares a close relationship with both his siblings.

Mr. Lotito describes his upbringing as a struggle for his parents of three children.  He grew up in what was once a lower-income area known as Sunset Park in Brooklyn, where he lived until he was sixteen years old.  His parents subsequently relocated to Staten Island, where they all resided in a rental apartment.

Mr. Lotito was a very good student and devoted hockey player while in high school.  If not for the pressure he felt to help support the family household, he feels as though he could have attended college on a hockey scholarship.  Instead he chose to get a job to help with the economical pressures his parents faced.  Some years later in 1989, Mr. Lotito attended the State University of New York, Empire State College, where he attained an Associates Degree, which was required by Local 3, his employer at that time.

However, while in high school (Susan E. Wagner High School) Mr. Lotito met his wife Michele, who he married on October 9, 1988.  Together they produced two daughters, Diondra Michele (age 18), a freshman at St. John's University in Queens, New York, and Dominique (age 14) a freshman at Saint Joseph by the Sea High School.

Although now separated from their mother, Mr. Lotito shares a very close relationship with both his daughters and his ex-wife.  They maintain residency with Mrs. Lotito, in a home where they all once lived.  However due to the fact that they can no longer afford the mortgage, the home is currently in foreclosure.  Mr. Lotito now resides in the basement apartment of a semi-attached home which is owned by his father and sister.

Mr. Lotito's wife Michele states that he is involved in "every aspect of his children's lives."  His younger daughter Dominique was diagnosed in 2004 with a pre-diabetic condition called "Insulin Resistant Syndrome," and

JOSEPH R. BENFANTE

lives with the fact that she will eventually develop Type I Diabetes.

Both Mr. Lotito and his wife are concerned as to how their younger daughter Dominique will handle his incarceration, as she is a very shy and emotional child who will most likely require professional counseling to help deal with her father's absence.

Mrs. Lotito although shocked to learn of the defendant's involvement in the instant matter strongly feels that that he became involved mainly for monetary reasons, because of his deep devotion to provide for his daughters. Mr. Lotito never wanted his daughters to live under the financial strain that he and his siblings did as children.

### VII.

**RICHARD LOTITO WAS ARRESTED OCTOBER 7, 2009 AND FROM THAT DAY, UNTIL THE PRESENT – <u>A PERIOD OF ALMOST TWO YEARS</u> – RICHARD LOTITO HAS FULLY COMPLIED WITH ALL OF HIS BAIL CONDITIONS AND PRE-TRIAL REQUIRMENTS**

With the uncertainty of his future, plaguing him for approximately this last two (2) years; the loss of his job of sixteen years with the City of New York – his debilitating and serious health problem coupled with his responsibility to his family – Mr. Lotito has managed to steadfastly abide by all of his bail and pretrial reporting conditions; without incident.

JOSEPH R. BENFANTE

## VIII.

**RICHARD LOTITO HAS THROUGHOUT HIS ENTIRE LIFE, SOUGHT OUT AND ACHIEVED GAINFUL EMPLOYMENT AND PRIOR TO HIS ARREST FOR A PERIOD OF 16 YEARS WAS A TRUSTED AND VALUED EMPLOYEE WITH THE NEW YORK CITY HOUSING PRESERVATION AND DEVELOPMENT AGENCY**

It is respectfully submitted that Richard Lotito has distinguished himself in relation to his exceptional work ethic.

For sixteen (16) years – up to and shortly after the time of his arrest – Richard Lotito was a trusted and valued employee with the New York City Housing Preservation and Development Agency; (NYCHPD).

At the time of Richard Lotito's termination, Mr. Lotito held the position of Supervising Demolition Inspector.

Letters from two prior supervisors, describing Mr. Lotito's technical skills, honesty, trustworthiness and responsible public safety standards, speaks volumes of defendant's character and work history.

The first letter is written by Paul Reynolds, a former Deputy Director of the Demolition Unit of Housing Preservation and Development (HPD). Mr. Lotito worked closely with Paul Reynolds for a period of four (4) years; until Mr. Reynolds retired in 2008. Mr. Reynolds writes of Mr. Lotito's outstanding work performance and his honorable and trustworthy qualities. His letter states as follows:

JOSEPH R. BENFANTE

To The Honorable Judge Nicholas Garaufis:

From May 2004 till my retirement in December 2008, I was the Deputy Director of the Demolition Unit of Housing Preservation and Development (HPD).

During my employ with HPD Mr. Richard Lotito reported to me as Supervising Demolition Inspector. He responded to emergency declarations issued by New York City Department of Buildings (DOB). His function was to coordinate the compliance of demolition/repair of private and NYC owned properties to meet the mandates and compliance of DOB's emergency declarations. On numerous occasions he responded to after hour emergencies. His function was to coordinate between HPD's Demolition contractor, the Office of Emergency Management (OEM), DOB, Fire Department of New York (FDNY) and New York City Police Department (NYPD) his performance was outstanding.

Richard Lotito proved to be an employee with extensive technical and leadership qualities. He also demonstrated extensive honorable and trustworthy qualities.

Should you require additional information please contact me.

Sincerely,

Paul Reynolds


The second letter is submitted by Michael J. Murphy of the NYC Housing Preservation and Development Demolition Unit (HPD), for whom Richard Lotito also worked with at the HPD for a period of six (6) years; in his capacity as a Supervising Demolition Inspector.   Mr. Murphy describes Mr. Lotito as honest, trustworthy and responsible, and writes on his behalf as follows:

9

JOSEPH R. BENFANTE

To Honorable Nicholas G. Garaufis:

I am writing this letter of reference for Supervising Demolition Inspector Richard Lotito. Mr. Lotito worked for me at HPD from October 2003 through September 2009. During that time, he worked many after-hours emergencies, including mid-town crane collapses, major fires and countless other citywide emergencies. Throughout, he worked well with other agencies such as DOB, OEM and FDNY. Over the course of his career at HPD, I found him to be honest, trustworthy and responsible. I hold his technical skills in the highest regard. On every occasion, I knew I could count on him to cover the tough jobs, as he always had public safety as his primary concern.

Please feel free to contact me at 212 863-7076 or e-mail murphym@hpd.nyc.gov for any additional information.


Respectfully,

Michael J. Murphy
NYC HPD Demolition Unit


The above recited letters of Mr. Paul Reynolds and Mr. Michael J. Murphy are annexed hereto collectively as Exhibit "B."

It is noteworthy that after Richard received an Academic Diploma form Susan E. Wagner High School of Staten Island, in 1982, he enrolled in a four (4) year apprenticeship program, sponsored by the IBEW Local 3 Electricians Union.

It was Richard's ambition to become a licensed electrician and in four (4) years he successfully received an Associates Degree in Electrical Science. Richard worked long and grueling hours during the day and attended classes at night.

JOSEPH R. BENFANTE

Classes were held at the Empire State College for electrical training located at 42ⁿᵈ Street in Manhattan.

During the daytime, Richard worked for ADCO Electrical Corp., installing electrical circuitry at different job locations as designated by the company.

At the end of four (4) years, Richard passed his final test and was entitled to top pay as an "A" Journeyman."

Unfortunately Richard suffered a serious electrical explosion, due to ancient faulty wiring, at an old department store location in Brooklyn.

The explosion resulted in Richard suffering second and third degree burns to his face, ears and arms, causing him to spend twenty-seven (27) days at the Cornell Burn Center located at the Cornell Medical Center in Manhattan.

The trauma at age 25 of the electrical explosion was responsible for Richard changing his vocation. Consequently, a short time thereafter, he became employed at a Demolition Company doing business as JDF Transfer Inc., where he became a foreman from 1989 until 1996.

**IX.**

**THE DEFENDANT RICHARD LOTITO'S DEBILITATING, LIFELONG AND CHRONIC TYPE I DIABETES, REQUIRING THE USE OF A SUBCUTANEOUS PUMP, IS EXTRAORDINARY AS FALLING WITHIN THE AMBIT OF U.S.S.G. 5H1.4, WHEREBY DEFENDANT RESPECTFULLY SEEKS A DOWNWARD DEPARTURE**

Richard Lotito has been diabetic for over fifteen years, having first been diagnosed with Type II Diabetes and thereafter with Type I.

JOSEPH R. BENFANTE

By way of a narrative report dated May 10, 2010, his current treating physician, Dr. Seshadri Das, M.D., reports that Mr. Lotito currently has what is termed Type I Diabetes with Neurological Manifestations and Cellulites. Having Type I Diabetes caused Mr. Lotito to become more susceptible to Cellulites, because of impairment of his immune system.

Richard Lotito was at various times prescribed Levaquin from 500 to 750 mg; a very powerful antibiotic used to treat certain types of skin infections. However, Levaquin comes with varied and serious side effects.

In addition to being treated with antibiotics for infection, Mr. Lotito administers Humalog, insulin .6 units per hour - 24 hours a day, via an external pump. Mr. Lotito must also have consistent meals throughout the day, and test his blood sugar three to four times per day as well. Annexed hereto as Exhibit "C" collectively, are some of Richard Lotito's medical reports as prepared by Dr. Seshadri Das, and doctors from his office for the Court's perusal.

Dr. Jeffrey Gumprecht, M.D., a Board Certified Internal Medicine and Infectious Disease Physician, associated with Mount Sinai Hospital in Manhattan, has examined and treated Richard Lotitio; states in his medical report as follows:

Your Honor:

I have been consulted by Mr. Richard Lotito to examine his current medical condition. I am currently board certified in Internal Medicine and Infectious Diseases. I hold an appointment as Assistant Clinical Professor of Medicine at the Mount Sinai School of Medicine. I have been continuously engaged in the private practice of internal medicine and infectious diseases since my completion of a fellowship in July, 1990. I have familiarity with effects of incarceration

12

JOSEPH R. BENFANTE

from a variety of sources, including having acted as an expert for the United States Department of Justice in a medical malpractice action occurring during incarceration and providing care to uninsured patients with HIV infection, some of whom were repeatedly incarcerated.

I have reviewed Mr. Lotito's medical records and examined him on May 26, 2011 and on September 12, 2011.  Mr. Lotito has been diabetic for greater than fifteen years and has been insulin dependent for six years. Mr. Lotito has extremely difficult to control (brittle) diabetes.  Aggressive attempts to lower his blood glucose have provoked numerous episodes of low blood sugar with significant symptoms. Accordingly, the safest control of his diabetes has been through the use of an insulin pump.  He wears this device twenty four hours a day and it delivers insulin through a subcutaneous needle which remains in place under the skin.

Because of his prior poor diabetic control he has developed numerous serious complications of his diabetes. These complications include retinopathy (vascular changes in his eyes with significant loss of vision), loss of sensation in legs and hands (peripheral neuropathy), impotence, damage to his kidneys (diabetic nephropathy), and recurrent skin infections including abscesses and cellulitis and at the time of this examination he has two draining furuncles on his left buttock. (diabetes causes poor immune function and poor wound healing).

Mr. Lotito can prevent the progression and possibly achieve partial reversal of his diabetic complications by incremental improvement in his diabetic control.  He has demonstrated that his best control is achieved by using the insulin pump and he clearly should continue to use the pump.  He also needs access to an appropriate

JOSEPH R. BENFANTE

diet which should be low in carbohydrates of all kinds. I am aware that both of these are unlikely during incarceration. An additional concern for Mr. Lotito is that prison conditions are well documented to cause outbreaks of skin infections including methicillin resistant Staphylococcus aureus (MRSA) and impetigo. Mr. Lotito is at high risk of acquiring such infections with complications because of the insulin pump needle which remains in his subcutaneous tissue. Mr. Lotito has already demonstrated predisposition to recurrent soft tissue infections due to his diabetes. Such skin conditions as were manifested during previous outbreaks have left discoloration and blotching in various areas of Mr. Lotito's back.

As a consequence of Mr. Lotito's advancing Type I Diabetes and reliance on the subcutaneous use of the "pump," it is my opinion that a period of incarceration would greatly jeopardize his already poor health by exposing him to a high risk of recurrent soft tissue infections and by interfering in the treatment of his brittle diabetes.

Sincerely,

Jeff Gumprecht, MD


Dr. Gumprecht's medical report dated September 12, 2011, is hereby annexed hereto and marked as Exhibit "D."

JOSEPH R. BENFANTE

## X.

### RICHARD LOTITO HAS AGREED AND FULLY PAID HIS FORFEITURE, PURSUANT TO THE PLEA AGREEMENT AND A SEPARATE PRELIMNARY ORDER OF FORFEITURE

As addressed in the Plea Agreement, Richard Lotito has agreed to the forfeiture of his property in the amount of Forty Five Thousand ($45,000.00) Dollars. Accordingly, a Preliminary Order of Forfeiture was duly executed dated January 2011, annexed hereto as Exhibit "E."

Further, on or about September 12, 2011, defense counsel herein spoke to AUSA Claire Kedeshian of the Eastern District Civil Forfeiture Division. AUSA Kedeshian informed said counsel that Richard Lotito has satisfied his Forty-five Thousand ($45,000.00) Dollar forfeiture, in full satisfaction of his agreement.

## XI.

### ATTESTATIONS OF DEFENDANT'S CHARACTER

Attached hereto are numerous letters submitted on behalf of Richard Lotito attesting to his basic decency. In particular, I would like to direct the Court's attention to the letters duplicated in the main body of this letter, which captures the sincerity, integrity and finer qualities which Richard Lotito is endowed with; and which express insights into his character for your consideration. These letters are annexed hereto collectively for the Court's perusal as Exhibit "F."

The first letter is written by Diondra Lotito, Richard's oldest daughter. She writes of how her father is always there for the entire family, and how he puts her and her younger sister above everything else in his life. She writes on her father's behalf as follows:

JOSEPH R. BENFANTE

Dear Sir:

My name is Diondra Lotito and I am the daughter of Richard Lotito. My father is a very important aspect in my life and I love him very much. I love and admire my father very much and as I've gotten older I have realized how lucky I am to have a father like him. Over the years I have met many of my friends father's and I have learned that my father is one of the most amazing men that I have ever met He puts my sister and me before everything else in his life and always goes above and beyond for us. After I went away to college I realized how much he really does for me and how hard it was to be away from him. What I love most about my dad is how generous he is. He is always helping his friends and family when they need him. I always call my father the "Mayor of Staten Island" because every time I go somewhere with him we run into some one he is friends with and many of these people always tell me how much they love my father and what a great guy he is. I believe that these people love my father so much because of how generous and caring he is and they know that they can always depend on my dad. I know that my father may have committed a crime but from being with him every day I truly know that he is not a bad person. I also know that my dad must be punished for committing these crimes but I hate to think that he will be away from my family for so long. My sister and I are both very scared for my father and do not know what will happen to him. Being away from him is going to be the hardest time of our lives but we understand that it must happen. I just hope that the court understands that he is a very important part of many people's lives and does not deserve to be away from the people that love him for so long.

Sincerely,

Diondra Lotito

JOSEPH R. BENFANTE

The second letter submitted on behalf of Richard Lotito is from his younger daughter, Dominique Lotito, who describes her father as her "best friend."  With her older sister in college now, she has developed an even closer relationship with her father who picks her up every day from school; takes her and her friends wherever their outing may be; and is the dad who attends every dance recital and dance competition.  Dominique's letter is as follows:

Dear Sir:

Everyone has a best friend. Someone who is there for them whenever they need them. Someone who they can tell anything to. A best friend is someone that will never leave your side and will do anything to make you smile. My best friend is my daddy. My dad is the most amazing person I know. Whenever he walks into a room, his goal is always to make everyone else in that room smile, laugh, and have a good time; and he always succeeds in that. My father and I spend the most time together out of anyone in our family. Every day he picks me up from school and is always the first person to realize if something bothered me that day. After he picks me up from school he brings my friends and I out for lunch wherever we want to go. Then, when we are done eating we drive home jamming out to the radio in his car. All of my friends know my dad and every single one of them thinks he is a great man. They tell me all the time how lucky I am to have such a cool dad. My dad is the type of person who will do anything for his family. He will buy us the closest seats possible for our favorite concerts, he will drop everything he is doing if my sister or I need him, and he did everything he could to make my Fabulous 15 and my sisters Sweet 16 absolutely perfect for us. One of my favorite things about my dad is his dancing. Whenever we go to a family party, you will always find my dad and I doing the hustle on the dance floor. I also love how whenever I don't feel good, all I have to do is go sit on my

JOSEPH R. BENFANTE

dad's lap, give him a hug, and I know I will instantly feel better. One of my favorite memories of my dad is when we went to work on his Ralph's ice trucks together. He would always pay me in presents. Not only is my dad my father and best friend, but he is also my biggest fan. He is at every single St. Joseph by the Sea Vikings volleyball game wearing a Viking hat in the crowd cheering me on. He goes to every one of my dance recitals and dance competitions. He recently told me no matter what score I get from a judge, I will always be a high gold to him. I am aware that my father has done something wrong. I do not understand what it is about though. Even though what he did was not right, it doesn't mean that he is a bad person. He is still the amazing father/person he has been for the last 15 years of my life and I will always love him no matter what.

Sincerely,

Dominique Lotito

The third letter is written by Michele Lotito, Richard Lotito's wife of over twenty (20) years. Although separated now they shared a total of thirty (30) years together, which included the years they dated. Michele Lotito's two main fears of Richard Lotito's possible incarceration, is that both she and their two daughters maintain a very close relationship with him, and that loss will be devastating to their girls. In addition, she worries about his health, in that he is insulin dependent, via the subcutaneous use of the "pump." She writes lovingly about Richard as follows:

JOSEPH R. BENFANTE

**Dear Sir:**

I feel that it's important that I write you a letter regarding the character of Richard Lotito because I feel I know him the best My name is Michele Lotito and I was married to Richard for 20 years, we dated for 6 years prior to that and we were best friends for 2 years before that At this point, I have his last name longer than I had my maiden name. For 3 decades Richie was the center of my world, and the most important part of my life along with our 2 children. When we met as teenagers in high school we immediately became best friends. I soon learned that even though we came from different backgrounds we had the same values and goals in life. Once I got to know him intimately, I knew this was the man I wanted to spend the rest of my life with. He is a kind, honest, loving, caring, and generous man. Over the years I have seen him help so many people less fortunate men him. He's always looking to help the underdog. He had a very poor, but happy and loving childhood. That's what made him such a giving and loving father and husband. He always treated me well and is a wonderful father. He does everything for his children, and is always there for them when they need him. He picks them up from school so they get to spend quality time together while I'm at work. He takes them to eat, to the gym, gets to know their friends, and is very involved in their lives, their schoolwork, and there after school activities and sports. He is such a huge part of their lives and they look up to and admire him so much. They are going to be lost and devastated without him around and he will feel the same way without them. They understand what's going on and it's a very traumatizing and scary time for them. I hope that you will consider that this affects the children greatly. We all feel that the court is being harsh on him for the crime that he may have committed. He has even said that he knows he has to be punished but he doesn't deserve to be away from his family for so long. He and the children will miss out on so many

JOSEPH R. BENFANTE

things together and he will be greatly missed by so
many people. Even though we separated from each
other 3 years ago, I still feel he is an extremely
honorable man. He is a loyal friend, and an involved
and concerned parent I am very worried about his
health and how he will manage his diabetes, and I
hope this stress does not affect him and shorten his
life. Even though we are no longer together, my
family is also very upset over this and concerned
about him. My mother still thinks of him as a son,
my sister thinks of him as a brother because they
remember all of the good things he's done for them
over the years. I'm glad he and I have a good
relationship today because I still need him in my
life in some way. People ask me why am I still so
nice to him and I say because I haven't forgotten
all of the good things he has done for me in the
past years either. No matter what happened between
us, the good definitely outweighs the bad, that's
why I'm wishing the best for him, and hoping you'll
be lenient on him. Thank you.

Sincerely yours,

Michele Lotito


    The fourth letter is written by Mr. Lotito's father,
Richard Lotito, Sr., age 70.  Mr. Lotito lost his wife
seven years ago, and depends solely on his children to
accompany him to his various doctor appointments for his
present heart condition.  His letter is as follows:


Dear Honorable Judge,

My name is Richard Lotito, the Father of Richard
Lotito. I am a retired iron worker. I was disabled
in 1973 when I fell off a building.  I have been on
social security since the accident.

JOSEPH R. BENFANTE

My son has been very helpful in aiding me by taking me to my doctor appointments as I have a heart condition. He has also been very emotionally supportive to me since the death of my wife in 2004.

As many people have made mistakes in their lives, my son is no exception. Yet, he has always been a loving caring human being that has helped me through some of my life's toughest times. He is a doting father, a supportive brother and most of all a loving son.

I would like to ask leniency with my son as I do not know how I will be able to continue without his support.

Sincerely,

Richard Lotito

The fifth letter is submitted by Michelle Lotito, Richard Lotito's sister. She expresses the support she and her family received from Richard when their mother passed away so suddenly. She also writes of the extraordinary relationship her brother Richard has with his two daughters, Diondra and Dominique. Her letter is as follows:

Dear Honorable Judge,

My name is Michelle Lotito, I am the sister of Richard Lotito. I am a hair dresser and work for Hair Club for Men for the last 10 years. Richard Lotito and I have been very close for the 45 years of my life. We have always been a very close family as adults and also children. I'm always with my brother and his family which he has 2 beautiful girls that I am also extremely close with. I understand that he has been convicted of a crime, but he is a very loving, supporting, and a true friend and

JOSEPH R. BENFANTE

brother to me. He was my rock when our mother passed away seven years ago. We all were very close with her and devastated with her sudden passing. I thought I would never function or pull myself together and my brother Richard pulled me back up and helped me through the worst time of my life. I don't think I would have been able to do that without him. Not only is he a great person to me but his two daughters have a relationship with him that I have never seen a dad have with their daughters. I truly need my brother in my life because it just wouldn't be right not seeing him or being with him all the time.

Sincerely,

Michelle Lotito

## XII.

## CONCLUSION

Richard Lotito's involvement in the instant offense is not a true reflection of the kind and sensitive person which I as his attorney feel compelled to highlight. The charge at bar, when compared to a lifetime history of being a responsible, caring, law-abiding and loving person is incongruent and in layman's terms a true aberration of his character.

Therefore, pursuant to the factors enumerated in Title 18 USC §3553(a), <u>United States v. Booker</u>, 543 U.S. 220; <u>United States v. Crosby</u>, 397 F.3d 103, (2nd Cir. 2005) and <u>Gall v. United States</u>, 552 U.S. 38, 128 S.Ct. 586 U.S. 2007 and most significantly his serious and extraordinary medical condition within the purview of U.S.S.G. Section 5H1.4; defense counsel most respectfully asks the Court, to impose a non-guideline sentence, of house arrest and/or probation.

JOSEPH R. BENFANTE

In doing so, it is respectfully asserted that a non-guideline sentence will be in accordance with Richard Lotito's prior unblemished record, prior good deeds, and altruistic character. Accordingly, the sentence will be "sufficient but no greater than necessary" to fulfill the ends of justice herein.

Respectfully submitted,

JOSEPH R. BENFANTE

JRB:jb
Enclosures

cc:  Nicole M. Argentieri, Esq.
     Stephen E. Frank, Esq.
     Assistant United States Attorneys (Via ECF)

     All Counsel (Via ECF)

**EXHIBIT "A"**

TM:GMP
F.#2009R01786

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

RICHARD LOTITO,

          Defendant.

- - - - - - - - - - - - - - - -X

<u>PLEA AGREEMENT</u>

09 CR 672 (S-1)(NGG)

       Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and RICHARD LOTITO (the "defendant") agree to the following:

     1.   The defendant will plead guilty to Count Five of the above-captioned indictment, charging a violation of 18 U.S.C. § 894(a)(1). The count carries the following statutory penalties:

         a.   Maximum term of imprisonment: 20 years (18 U.S.C. § 894(a)).

         b.   Minimum term of imprisonment: 0 years (18 U.S.C. § 894(a)).

         c.   Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision (18 U.S.C. § 3583(b) & (e)).

d.   Maximum fine: $250,000
     (18 U.S.C. § 3571(b)).

e.   $100 special assessment
     (18 U.S.C. § 3013).

f.   Restitution: to be determined by the Court
     (18 U.S.C. § 3663).

g.   Forfeiture (Count Five): applicable, in the
     approximate amount of $45,000 U.S. currency
     as set forth below in paragraphs 6 through
     16
     (18 U.S.C. § 981(a)(1)(C), 28 U.S.C.
     § 2461(c)).

2.   The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. The Office estimates the likely adjusted offense level under the Guidelines to be level 20, which is predicated on the following Guidelines calculation:

<u>Count Five (Extortionate Collection of Credit Conspiracy)</u>

Base Offense Level (2E2.1(a))                        20

Plus: Aggravating Role (3B1.1(c))                   +2

3

Less: Acceptance of Responsibility (3E1.1(a))        -2

Total:                                                20

This level carries a range of imprisonment of 33 to 41 months, assuming that the defendant has no prior convictions. If the defendant pleads guilty on or before January 21, 2011, the government will move the Court, pursuant to U.S.S.G. § 3E1.1(b), for an additional one-level reduction, resulting in an adjusted offense level of 19. This level carries a range of imprisonment of 30 to 37 months, assuming that the defendant has no prior convictions. The defendant stipulates to the above Guidelines calculation.

3.    The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4.    The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 41 months or below. This waiver is binding without regard to the sentencing analysis

4

used by the Court. The defendant waives all defenses based on
the statute of limitations and venue with respect to any
prosecution that is not time-barred on the date that this
agreement is signed in the event that (a) the defendant's
conviction is later vacated for any reason, (b) the defendant
violates this agreement, or (c) the defendant's plea is later
withdrawn. The defendant waives any right to additional
disclosure from the government in connection with the guilty
plea. The defendant agrees that with respect to all charges
referred to in paragraphs 1 and 5(a) he is not a "prevailing
party" within the meaning of the "Hyde Amendment," 18 U.S.C.
§ 3006A note, and will not file any claim under that law. The
defendant agrees to pay the special assessment by check payable
to the Clerk of the Court at or before sentencing.

     5.   The Office agrees that:

        a.   no further criminal charges will be brought
against the defendant for his participation
in (1) conspiring to make and making
extortionate extensions of credit to John Doe
#3, for the time period from December 1, 2003
through April 1, 2009, as alleged in Counts
Three and Four of the indictment; and
(2) conspiring to use and using extortionate
means to collect extensions of credit from
John Doe #3, for the time period from
December 1, 2003 through April 1, 2009, as
alleged in Counts Five and Six of the
indictment, it being understood that this
agreement does not bar the use of such
conduct as a predicate act or as the basis
for a sentencing enhancement in a subsequent
prosecution including, but not limited to, a
prosecution pursuant to 18 U.S.C. §§ 1961 et

JHN 13 2011 16:54 FR                                    TO 912124066890    P.06
Case 1:09-cr-00672-NGG   Document 391   Filed 09/13/11   Page 29 of 67 PageID #: 1781

5

seq., and at the time of sentence, it will
move to dismiss the remaining counts of the
indictment with prejudice;

and, based upon information now known to the Office, it will

b.    take no position concerning where within the
Guidelines range determined by the Court the
sentence should fall; and

c.    make no motion for an upward departure under
the Sentencing Guidelines.

If information relevant to sentencing, as determined by the
Office, becomes known to the Office after the date of this
agreement, the Office will not be bound by paragraphs 5(b) and
5(c). Should it be judged by the Office that the defendant has
violated any provision of this agreement, the defendant will not
be released from his plea of guilty but this Office will be
released from its obligations under this agreement, including but
not limited to (a) moving for the additional one-level downward
adjustment for timely acceptance of responsibility described in
paragraph 2 above, and (b) the provisions of paragraph 5(a)-(c).

6.    The defendant acknowledges that he received money
and property that is subject to forfeiture as a result of his
participation in an extortionate collection of credit conspiracy,
as alleged in Count Five of the superseding indictment. Pursuant
to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C.
§ 853(p), the defendant consents to the forfeiture of Forty-Five
Thousand Dollars in United States Currency ($45,000) ("the
Forfeiture Money Judgment") as property that constitutes or is

JHN 13 2011 16:55 FR                                        TO 912124065890    P.07
Case 1:09-cr-00672-NGG    Document 391    Filed 09/13/11    Page 30 of 67 PageID #: 1782

6

derived from proceeds traceable to an extortionate collection of credit conspiracy and/or as substitute assets. The Forfeiture Money Judgment includes, but is not limited to, the $3,079 in United States currency seized by law enforcement from the defendant at the time of his arrest on October 7, 2008. 2009

7. Defendant has completed and submitted to the Office a sworn Financial Statement, dated November 13, 2010, which shall be included and incorporated by reference as an attachment to this plea agreement. In partial satisfaction of the Forfeiture Money Judgment and based on the defendant's Financial Statement, defendant agrees to the United States' right to seize and to forfeit all right, title and interest in the following properties to the United States (collectively referred to as "the IRA and Seized Currency"):

(a) an IRA Account No. 7700074998, with Metropolitan Life Insurance Company, held in name of or for the benefit of Richard R. Lotito (SS # xxx-xx-5217), with a value, as of October 21, 2010, in the amount of at least $46,844.46; and

(b) the $3,079 in U.S. currency seized by law enforcement from the defendant at the time of his arrest on October 7, 2008.

8. The defendant consents to the entry of an Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure imposing the Forfeiture Money Judgment and including

7

forfeiture of the IRA and Seized Currency.  Payment of the Forfeiture Money Judgment shall be made by certified or bank check, payable to the United States Marshals Service within ninety (90) days of the date the defendant enters his plea of guilty pursuant to this agreement ("Due Date").  The defendant or any financial institution served with a copy of the Order of Forfeiture shall cause said check to be hand-delivered to Assistant United States Attorney Claire S. Kedeshian, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, with the criminal docket number noted on the face of the check.

9.   If the Forfeiture Money Judgment is not paid on or before the Due Date, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date.  If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant consents to the forfeiture of any other property alleged to be subject to forfeiture in the indictment.

10.  The defendant agrees that the above-referenced amount of the Forfeiture Money Judgment constitutes or is derived from proceeds traceable to the defendant's extortionate collection of credit conspiracy crimes and/or constitutes substitute assets, and thus is subject to forfeiture to the

United States pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C.
§ 2461(c), and 21 U.S.C. § 853(p).

11.   The defendant agrees not to file or interpose any
claim or to assist others to file or interpose any claim to any
property against which the government seeks to execute the
Forfeiture Money Judgment, including but not limited to the IRA
and Seized Currency, in any administrative or judicial
proceeding.

12.   The defendant shall remain fully liable to pay the
entire Forfeiture Money Judgment to the United States and shall
fully assist the United States in effectuating payment of the
Forfeiture Money Judgment.  Until the Forfeiture Money Judgment
is fully satisfied, the defendant shall not, directly or
indirectly, engage in any effort to transfer, sell, assign,
pledge, hypothecate, encumber or dispose of in any manner, or
cause to be transferred, sold, assigned, hypothecated,
encumbered, or disposed of in any manner the IRA, Seized
Currency, or any substitute assets.

13.   The failure of the defendant to forfeit any monies
and/or properties as required under this agreement, including the
failure of the defendant to execute any document to accomplish
same on timely notice to do so, shall constitute a material
breach of this agreement.  Upon such a breach, the defendant will
not be entitled to withdraw the plea, but the Office may bring

9

additional criminal charges against the defendant.  The Office
may also execute the Forfeiture Money Judgment upon any other
assets of the defendant, up to the outstanding balance, pursuant
to 21 U.S.C. § 853(p), the Federal Debt Collection Procedure Act,
or any other applicable law.

14.  The defendant knowingly and voluntarily waives his
right to any required notice concerning the forfeiture of the
monies forfeited hereunder, including notice set forth in an
indictment or information.  In addition, the defendant knowingly
and voluntarily waives his right, if any, to a jury trial on the
forfeiture of said monies, and waives all constitutional, legal
and equitable defenses to the forfeiture of said monies,
including, but not limited to, any defenses based on principles
of double jeopardy, the Ex Post Facto Clause of the Constitution,
the statute of limitations, venue, or any defense under the
Eighth Amendment, including a claim of excessive fines.

15.  The defendant agrees that the forfeiture of the
Forfeiture Money Judgment is not to be considered a fine or a
payment on any income taxes that may be due and shall not be
discharged in any bankruptcy proceeding.

16.  In the event that victims are identified and
restitution is ordered by the Court, the United States Attorney's
Office and the Federal Bureau of Investigation ("FBI") will
recommend to the Department of Justice that the forfeited funds

Case 1:09-cr-00672-NGG   Document 391   Filed 09/13/11   Page 34 of 67 PageID #: 1786

be used to compensate the victims.  The defendant should receive credit to his restitution obligation to the extent forfeited funds are paid to victims owed restitution.  Notwithstanding the recommendation of this Office and the FBI, all final decisions with regard to the use of the forfeited funds toward restitution obligations are made by the United States Department of Justice's Asset Forfeiture and Money Laundering Section in Washington, D.C.

17.  This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

18.  No promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties.  This agreement supersedes all prior promises, agreements or conditions between the parties.  To

11

become effective, this agreement must be signed by all

signatories listed below.

Dated:      Brooklyn, New York
                        , 2011

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York

                        By:    _____
                                    Gina M. Parlovecchio
                                    Assistant United States Attorney

                                    Approved by:


                                    _____
                                    Taryn Merkl
                                    Supervising Assistant U.S. Attorney


I have read the entire agreement and discussed it with my
attorney. I understand all of its terms and am entering into it
knowingly and voluntarily.


_____
RICHARD LOTITO
Defendant

Approved by:


_____
Joseph Benfante, Esq.
Counsel to Defendant

EXHIBIT "B"

October 28, 2010

To The Honorable Judge Nicholas Garaufis

RE: Richard Lotito
Supervising Demolition
Inspector

From May 2004 till my retirement in December 2008 I was the Deputy Director of the Demolition Unit of Housing Preservation and Development (HPD).

During my employ with HPD Mr. Richard Lotito reported to me as Supervising Demolition Inspector. He responded to emergency declarations issued by New York City Department of Buildings (DOB). His function was to coordinate the compliance of demolition/repair of private and NYC owned properties to meet the mandates and compliance of DOB's emergency declarations. On numerous occasions he responded to after hour emergencies. His function was to coordinate between HPD's Demolition contractor, the Office of Emergency Management (OEM), DOB, Fire Department of New York (FDNY) and New York City Police Department (NYPD) his performance was outstanding.

Richard Lotito proved to be an employee with extensive technical and leadership qualities. He also demonstrated extensive honorable and trustworthy qualities.

Should require additional information please contact me.

Sincerely,

Paul Reynolds
59 Roman Avenue
Staten Island,
New York 10314

E-mail: reynoldp1@gmail.com
Cell: 1(718) 612-4019

Michael J. Murphy
NYC HPD Demolition Unit
100 Gold Street, Room 6H-1
New York NY 10038

October 27, 2010

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

To Honorable Nicholas G. Garaufis:

      I am writing this letter of reference for Supervising Demolition Inspector Richard Lotitio. Mr. Lotitio worked for me at HPD from October 2003 through September 2009. During that time, he worked many after-hours emergencies, including mid-town crane collapses, major fires and countless other citywide emergencies. Throughout, he worked well with other agencies such as DOB, OEM and FDNY. Over the course of his career at HPD, I found him to be honest, trustworthy and responsible. I hold his technical skills in the highest regard. On every occasion, I knew I could count on him to cover the tough jobs, as he always had public safety as his primary concern.

      Please feel free to contact me at 212 863-7076 or e-mail murphym@hpd.nyc.gov for any additional information.

Respectfully,

Michael J. Murphy
NYC HPD Demolition Unit

EXHIBIT "C"

# Seshadri Das M.D., M.R.C.P, F.A.C.E, F.A.C.P

45 Little Clove Road
Staten Island NY 10301
Tel: (718)273-5522 Fax: (718)273-6522

---

**FOLLOW UP PA KRISHMA PATEL**
**Physician: Seshadri Das, MD**
**Visit Date: April 5th 2011**

**Patient:  LOTITO RICHARD  - [MRN: 102523]**
**Date Of Birth: July 2nd 1963**

---

LOTITO, RICHARD is a 47 Year(s) old Male

**ALLERGIES/MEDICATION REACTIONS:** nka - nka (Active)

**PAST MEDICAL HISTORY:** DIABETES MELLITIS

**FAMILY HISTORY:**
  History collected from: Patient

**SOCIAL HISTORY/HABITS:**
  History collected from: Patient

**MASTER MEDICATIONS:**
1. HUMALOG VIA PUMP

**MASTER PROBLEM LIST:**
1. 250.61 - DIABETES W/NEURO MANIF TYPE 1 (Active)
2. 681.00 - CELLULITIS, FINGER NOS (Active)
3. 680.2 - CARBUNCLE OF TRUNK (Active)

**PHYSICAL EXAM:**
  **Vitals:**        BP Systolic: 126 mmHg, BP Diastolic: 70 mmHg,
                Weight: 201 lbs, Height: 72 in, BMI: 27.3 , **Blood
                Sugar** : 311 mg/dl.
  **Constitutional:** Well-developed, well-nourished, in no acute distress.
  **Skin:**        Erythematous raised warm areas back L side
  **Respiratory:**   Clear to auscultation bilaterally. No rales. No
                wheezing
  **Cardiovascular:** Regular rate and rhythm without S3, S4. No murmurs or
                rubs are appreciated.

**ASSESMENT/IMPRESSION:**
 **Existing Problems:**
 PROBLEM#1: DIABETES W/NEURO MANIF TYPE 1 (250.61) - BS has been high, not on
           the pump for BS. - MN .50, 6AM .65. carb ratio set at 1:15,
           sensitivity 1:50. Active 3 hrs. April 29th will have sentencing,
           then 4-6 weeks later. Needs to have better control of BS, admits
           to not being compliant with diet. (Active)

 **New Problems:**
 PROBLEM#1: CARBUNCLE OF TRUNK (680.2) - Two areas on the back on the right
           side. - Septra DS 1 pill BID, x 10 days. Warm compresses.

**PROCEDURES PERFORMED:**
 **1.** 36416 - CAPILLARY BLOOD DRAW
 **2.** 82947 - ASSAY, GLUCOSE, BLOOD QUANT
 **3.** 99214 - OFFICE/OUTPATIENT VISIT, EST
 **4.** -

Signed _____        Seshadri Das, MD  #1477664134

          For Kishme Patel

# Seshadri Das M.D., M.R.C.P, F.A.C.E, F.A.C.P

45 Little Clove Road
Staten Island NY 10301
Tel: (718)273-5522
Fax: (718)273-6522

FOLLOW UP PA KRISHMA PATEL
Physician:
Visit Date: October 1st 2010

Patient: LOTITO RICHARD  - [MRN: 102523]
Date Of Birth: July 2nd 1963

LOTITO, RICHARD is a 47 Year(s) old Male

ALLERGIES/MEDICATION REACTIONS: nka (Active)

REASON FOR VISIT: iddm on pump.

PAST MEDICAL HISTORY: DIABETES MELLITIS

FAMILY HISTORY:
  History collected from: Patient

SOCIAL HISTORY/HABITS:
  History collected from: Patient

MASTER MEDICATIONS:
1. HUMALOG VIA PUMP -mn-6a .5, 6a-mn .6 bolus 5-10u per meal

MASTER PROBLEM LIST:
1. 250.61 - DIABETES W/NEURO MANIF TYPE 1 (Active)
2. 681.00 - CELLULITIS, FINGER NOS (Active)

PHYSICAL EXAM:
  Vitals:            BP Systolic: 150 mmHg, BP Diastolic: 80 mmHg, Weight: 190 lbs,
                     Height: 72 in, BMI: 25.77 , Blood Sugar : 258fasting mg/dl, Testing BS Per
                     Day: occasional , Date of Last Podiatry Visit: severalyearsago , Date of
                     Last Opthalmology Visit: severalyearsago , Date of Last Cardiology
                     Visit: severalyearsago .
  Neck:              Supple. No JVD. No lymphadenopathy. No thyromegaly.
                     minimal enlargement of left lobe. EUTHYROID.
  Respiratory:       Clear to auscultation bilaterally. No rales. No wheezing
  Cardiovascular:    Regular rate and rhythm without S3, S4. No murmurs or rubs are
                     appreciated.
  Musculoskeletal:   Normal strength in all muscle groups. Normal range of motion of all

|                | joints. No joint effusions. No muscle masses. |
|----------------|-----------------------------------------------|
| Neurologic:    | Alert and oriented x3. Cranial nerves II through XII are intact. Motor strength is 5/5 and equal in all four extremities. Deep tendon reflexes are 2/4 and equal bilaterally. No focal deficit. |

**ASSESMENT/IMPRESSION:**

Existing Problems:

PROBLEM#1: DIABETES W/NEURO MANIF TYPE 1 (250.61) - Pt is diabetic for 15 yrs. Has been on insulin for 5-6 years. Since bs were very erractic, ot was placed on insulin pump for 1.5 years ago. Pt is currently on basal rate -- .5 units / hr from midnight to 6 am and from 6 am to midnight .6 units/hr. Has parathesias of extremities. Pt says he complies better w/ diet better than before. Pt works out 4 days a week. He continues to have erectile dysfunction. hormone work up in 2009 came back normal for testicular dysfunction. Has blurry vision. Pt was arrested in Oct. 2009. HE is out on bail at this time. He is going through a lot of stress. His sugars have been labile. Pt restarted the insulin pump one month ago after having finacial difficulties getting pump supplies and insulin. Had lab work last done 1 yr ago in 2009. HBA1C in 2009 was 9.0% today HBA1C taken in office was 8.4%. Pt has learned to use the pump better the longer he has had it. He does get occasional hypoglycemia. But while on multiple basal/bolus insulin pt was symptomatic for uncontrolled diabetes and had highly irregular blood sugars. (Active)

**PROCEDURES PERFORMED:**

1. 36416 - CAPILLARY BLOOD DRAW
2. 82947 - ASSAY, GLUCOSE, BLOOD QUANT
3. -

Signed _____

LOTITO, RICHARD 7/2/1963 Male

# Seshadri Das M.D., M.R.C.P, F.A.C.E, F.A.C.P

45 Little Clove Road
Staten Island NY 10301
Tel: (718)273-5522
Fax: (718)273-6522

45 Little Clove Road
STATEN ISLAND NY 10301
Tel:
Fax:

---

**Follow up WALK IN**
**Physician: Seshadri Das, MD**
**Visit Date: May 10th 2010**

**Patient:  LOTITO RICHARD  - [MRN: 102523]**
**Date Of Birth: July 2nd 1963**

---

LOTITO, RICHARD is a 46 Year(s) 10 Month(s) 8 Day(s) old Male

**ALLERGIES/MEDICATION REACTIONS:** nka (Active)

**REASON FOR VISIT:** R HAND INFECTION FOLLOW UP.

**PAST MEDICAL HISTORY:** DIABETES MELLITIS

**FAMILY HISTORY:**
  History collected from: Patient

**SOCIAL HISTORY/HABITS:**
  History collected from: Patient

**MASTER MEDICATIONS:**
**1.** HUMALOG VIA PUMP -

**MASTER PROBLEM LIST:**
**1.** 250.61 - DIABETES W/NEURO MANIF TYPE 1 (Active)
**2.** 681.00 - CELLULITIS, FINGER NOS (Active)

**PHYSICAL EXAM:**
  **Vitals:**            BP Systolic: 141 mmHg, BP Diastolic: 91 mmHg, Pulse
                         Rate: 90 beats/min, Blood Sugar : 173(FASTING) mg/dl.
  **Constitutional:**  Well-developed, well-nourished, in no acute distress.
  **Skin:**              No rashes or lesions.
  **Neck:**              Supple. No JVD. No lymphadenopathy. No thyromegaly.
  **Respiratory:**     Clear to auscultation bilaterally. No rales. No wheezing
  **Cardiovascular:**  Regular rate and rhythm without S3, S4. No murmurs or rubs are
                         appreciated.

**ASSESMENT/IMPRESSION:**
**Existing Problems:**
PROBLEM#1: DIABETES W/NEURO MANIF TYPE 1 (250.61) - Did not have pump on last
       night. - Needs to keep pump on at all times. Having problem with ED. Viagra
       50mg QD. (Active)
PROBLEM#2: CELLULITIS, FINGER NOS (681.00) - Stable. (Active)


**PROCEDURES PERFORMED:**
**1.** 82947 - ASSAY, GLUCOSE, BLOOD QUANT
**2.** 36416 - CAPILLARY BLOOD DRAW
**3.** -

Signed _____ Seshadri Das, MD  #1477664134

# Seshadri Das M.D., M.R.C.P, F.A.C.E, F.A.C.P

45 Little Clove Road
Staten Island NY 10301
Tel: (718)273-5522
Fax: (718)273-6522

45 Little Clove Road
STATEN ISLAND NY 10301
Tel:
Fax:

---

**Follow up WALK IN**
**Physician: Seshadri Das, MD**
**Visit Date: April 12th 2010**

**Patient:  LOTITO RICHARD  - [MRN: 102523]**
**Date Of Birth: July 2nd 1963**

---

LOTITO, RICHARD is a 46 Year(s) 9 Month(s) 10 Day(s) old Male

**ALLERGIES/MEDICATION REACTIONS:** nka (Active)

**REASON FOR VISIT:** PATIENT HAS AN INFECTION ON R POINTER FINGER. WAS GIVEN ANTIBIOTIC LEVAQUIN.

**PAST MEDICAL HISTORY:** DIABETES MELLITIS

**FAMILY HISTORY:**
  **History collected from:** Patient

**SOCIAL HISTORY/HABITS:**
  **History collected from:** Patient

**MASTER MEDICATIONS:**
**1.** HUMALOG VIA PUMP -

**MASTER PROBLEM LIST:**
**1.** 250.61 - DIABETES W/NEURO MANIF TYPE 1 (Active)
**2.** 681.00 - CELLULITIS, FINGER NOS (Active)

**PHYSICAL EXAM:**
  **Vitals:**          BP Systolic: 145 mmHg, BP Diastolic: 90 mmHg, Pulse
                       Rate: 87 beats/min, Blood Sugar : 166 mg/dl.
  **Constitutional:** Well-developed, well-nourished, in no acute distress.
  **Skin:**           2nd digit, Improvement. Erythematous area, not extending as far, pustules.
  **Respiratory:**    Clear to auscultation bilaterally. No rales. No wheezing
  **Cardiovascular:** Regular rate and rhythm without S3, S4. No murmurs or rubs are
                       appreciated.

**ASSESMENT/IMPRESSION:**
**Existing Problems:**
PROBLEM#1: DIABETES W/NEURO MANIF TYPE 1 (250.61) - On Pump, had one
hypoglycemic episode in middle of night. - Reduce Mn-6AM to .5, needs to have
consistent meals
PROBLEM#2: CELLULITIS, FINGER NOS (681.00) - Improving, observe. Samples of Levaquin
500mg given, one a day. If not better, ER.


**PROCEDURES PERFORMED:**
**1.** 82947 - ASSAY, GLUCOSE, BLOOD QUANT
**2.** 36416 - CAPILLARY BLOOD DRAW
**3.** -

Signed _____ Seshadri Das, MD  #1477664134

# Seshadri Das M.D., M.R.C.P, F.A.C.E, F.A.C.P

45 Little Clove Road
Staten Island NY 10301
Tel: (718)273-5522
Fax: (718)273-6522

45 Little Clove Road
STATEN ISLAND NY 10301
Tel:
Fax:

---

**Follow up WALK IN**
**Physician: Das Seshadri, MD**
**Visit Date: April 8th 2010**

**Patient:  LOTITO RICHARD  - [MRN: 102523]**
**Date Of Birth: July 2nd 1963**

---

LOTITO, RICHARD is a 46 Year(s) 9 Month(s) 6 Day(s) old Male

**ALLERGIES/MEDICATION REACTIONS:** nka (Active)

**REASON FOR VISIT:** PATIENT HAS AN INFECTION R POINTER FINGER. PATIENT ALSO HAS SYMTPOMS OF LIGHTHEADNESS, NAUSEA.PATIENT HAS BEEN TAKEN AMOXICILLIN SINCE YESTERDAY GIVEN BY HIS SISTER.

**PAST MEDICAL HISTORY:** DIABETES MELLITIS

**FAMILY HISTORY:**
  History collected from: Patient

**SOCIAL HISTORY/HABITS:**
  History collected from: Patient

**MASTER MEDICATIONS:**
**1.** HUMALOG VIA PUMP -

**MASTER PROBLEM LIST:**
**1.** 250.61 - DIABETES W/NEURO MANIF TYPE 1 (Active)
**2.** 681.00 - CELLULITIS, FINGER NOS (Active)

**PHYSICAL EXAM:**
  **Vitals:**      BP Systolic: 151 mmHg, BP Diastolic: 94 mmHg, Pulse Rate: 94 beats/min, Blood Sugar : 204(FASTING) mg/dl.
  **Constitutional:** Well-developed, well-nourished, in no acute distress.
  **Skin:** Erythematous, edematous 2nd digit R hand, Erythema extending to Metacarpal area. Fluid out of 2nd digit.
  **Respiratory:** Clear to auscultation bilaterally. No rales. No wheezing
  **Cardiovascular:**
         Regular rate and rhythm without S3, S4. No murmurs or rubs are

appreciated.

**ASSESMENT/IMPRESSION:**
**Existing Problems:**
PROBLEM#1: DIABETES W/NEURO MANIF TYPE 1 (250.61) - Out of pump supplies and
Insulin since Nov. Was in legal trouble and lost coverage. - Pump supplies give
and Novolog vials.

**New Problems:**
PROBLEM#1: CELLULITIS, FINGER NOS (681.00) - Started two days ago, worsening. On
Amoxicillin. - Start Levaquin 750mg, samples given. Soak in Warm water and
epsom salt. If worsens, ER, may need I&D.

**PROCEDURES PERFORMED:**
**1.** 82947 - ASSAY, GLUCOSE, BLOOD QUANT
**2.** 36416 - CAPILLARY BLOOD DRAW
**3.** -
**Follow-up Visit:** Monday-5 days.
Signed _____ Das Seshadri, MD  #12345

# Seshadri Das M.D., M.R.C.P, F.A.C.E
### 45 Little Clove Road Staten Island NY 10301
### Tel: (718)273-5522        Fax: (718)273-6522

| | |
|---|---|
| **FOLLOW UP OFFICE VISIT**<br>Physician: Seshadri Das, MD<br>Visit Date: October 21st 2009 | **Patient:  LOTITO RICHARD  - [102523]**<br>**Date Of Birth: July 2nd 1963** |

LOTITO, RICHARD is a 46 year/s old Male

**ALLERGIES/MEDICATION REACTIONS:** nka (Active).

**REASON FOR VISIT:** DIABETES/ PUMP.

**PAST MEDICAL HISTORY:** DIABETES MELLITIS.

**MASTER MEDICATIONS:**
1. HUMALOG 75/25 -15U BID
   Status: Inactive
2. HUMALOG VIA PUMP -.6U PER HR X 24 PLUS 10-15 U TIDAC
   Status: Active

**MASTER PROBLEMS:**
1. 250.60 - DIABETES W/NEURO MANIF TYPE 2 (Active)

**PHYSICAL EXAM:**
Vitals: BP Systolic: 136 mmHg, BP Diastolic: 82 mmHg, Weight: 200 lbs, Height: 72 in, BMI: 27.12 , Blood Sugar : 242 2HRS mg/dl.

**PROCEDURES PERFORMED:**
1. 36415 - ROUTINE VENIPUNCTURE
2. 82947 - ASSAY, GLUCOSE, BLOOD QUANT

Signed _____ Seshadri Das, MD #12345

**Seshadri Das, M.D., M.R.C.P, F.A.C.E.**

REFERRING PROVIDER: .................................................

Patient Name: _Lotito, Richard_     DOB: _7/2/03_   Date: _10/2/0_

Ht: ____ Wt: ____ Waist Circ/BMI: ____ / ____ B/P: ____ / ____ Pulse: ____ B/S: ____ HBA1C: ____

EYE CARE: Date: ____    FOOT CARE: Date: ____    MICROALBUMIN: Date: ____ Value: ____

Lipids: TC: ____ mg Tg: ____ mg HDLc: ____ mg HDL2: ____ mg LDLc: ____ mg Lpa: ____

Allergies: _____

Diagnosis: _____

**Endocrine Symptoms:**

☐ heat intolerance  Y / N     ☐ cold intolerance  Y / N     ☐ weight  gain / loss     ☐ night sweats Y / N     ☐ tremor  Y /

☐ paraesthesias Y / N     ☐ hypoglycemia  Y / N     ☐ polyuria Y / N     ☐ polydipsia Y / N     ☐ lethargy Y

☐ nocturia     ☑ vision     ☐ Shortness of breath     ☐ Chest pain     ☐ palpations     ☐ headaches

Gastro Intestinal:     ☐ constipation     ☐ diarrhea     ☐ gassy/bloating

☐ Libido:  Y / N

History: _(handwritten, illegible)_

Thyroid: _(handwritten)_        HEENT: _(handwritten)_

Chest: _(handwritten)_          Cardiac/EKG: _(handwritten)_

Abdomen: _(handwritten)_        Rectal: _(handwritten)_

Neuro: _(handwritten)_          Vascular/Peripheral/Carotid: ____

Extremities: _(handwritten)_    A/P: ____

_(handwritten notes, illegible)_

TC = Total Cholesterol        Tg = Triglycerides        Occult Blood Stools: ____

Next Appointment: _____        Signed: _(signature)_

EXHIBIT "D"

**Jeff Gumprecht, MD**
**Internal Medicine and Infectious Diseases**
**1100 Park Ave**
**New York, NY 10128**
**Tel 212-427-9550  Fax 212-427-9889**

September 12, 2011

Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Your Honor:

I have been consulted by Mr. Richard Lotito to examine his current medical condition.  I am currently board certified in Internal Medicine and Infectious Diseases.  I hold an appointment as Assistant Clinical Professor of Medicine at the Mount Sinai School of Medicine.   I have been continuously engaged in the private practice of internal medicine and infectious diseases since my completion of a fellowship in July, 1990.  I have familiarity with effects of incarceration from a variety of sources, including having acted as an expert for the United States Department of Justice in a medical malpractice action occurring during incarceration and providing care to uninsured patients with HIV infection, some of whom were repeatedly incarcerated.

I have reviewed Mr. Lotito's medical records and examined him on May 26, 2011 and on September 12, 2011.  Mr. Lotito has been diabetic for greater than fifteen years and has been insulin dependent for six years.  Mr. Lotito has extremely difficult to control (brittle) diabetes.  Aggressive attempts to lower his blood glucose have provoked numerous episodes of low blood sugar with significant symptoms.  Accordingly, the safest control of his diabetes has been through the use of an insulin pump.  He wears this device twenty four hours a day and it delivers insulin through a subcutaneous needle which remains in place under the skin.

Because of his prior poor diabetic control he has developed numerous serious complications of his diabetes.  These complications include retinopathy (vascular changes in his eyes with significant loss of vision), loss of sensation in legs and hands (peripheral neuropathy), impotence, damage to his kidneys (diabetic nephropathy), and recurrent skin infections including abscesses and cellulitis and at the time of this examination he has two draining furuncules on his left buttock. (diabetes causes poor immune function and poor wound healing).

Mr. Lotito can prevent the progression and possibly achieve partial reversal of his diabetic complications by incremental improvement in his diabetic control. He has demonstrated that his best control is achieved by using the insulin pump and he clearly should continue to use the pump. He also needs access to an appropriate diet which should be low in carbohydrates of all kinds. I am aware that both of these are unlikely during incarceration. An additional concern for Mr. Lotito is that prison conditions are well documented to cause outbreaks of skin infections including methicillin resistant Staphylococcus aureus (MRSA) and impetigo. Mr. Lotito is at high risk of acquiring such infections with complications because of the insulin pump needle which remains in his subcutaneous tissue. Mr. Lotito has already demonstrated predisposition to recurrent soft tissue infections due to his diabetes. Such skin conditions as were manifested during previous outbreaks have left discoloration and blotching in various areas of Mr. Lotito's back.

As a consequence of Mr. Lotito's advancing Type I Diabetes and reliance on the subcutaneous use of the "pump," it is my opinion that a period of incarceration would greatly jeopardize his already poor health by exposing him to a high risk of recurrent soft tissue infections and by interfering in the treatment of his brittle diabetes.

Sincerely,

Jeff Glumprecht, MD

**EXHIBIT "E"**

Case 1:09-cr-00672-NGG   Document 391   Filed 09/13/11   Page 56 of 67 PageID #: 1808

SLR:KN:CSK
F#2009R01786

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

RICHARD LOTITO,

              Defendant.

- - - - - - - - - - - - - -X

PRELIMINARY
ORDER OF FORFEITURE

09 CR 0672 (S-1)

(Garaufis, J.)

        WHEREAS on January ___, 2011 the defendant, Richard Lotito (the "defendant"), entered a plea of guilty to Count Five of the Indictment, charging a violation of 18 U.S.C. § 894(a) pled before this Court; and

        WHEREAS, in the above-captioned criminal action, the United States of America sought the forfeiture of any and all property constituting or derived from any proceeds traceable to defendant's, violation of Title 18 U.S.C. § 894(a); pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and/or substitute assets, pursuant to 21 U.S.C. § 853(p); and

        WHEREAS, on January ___, 2011, the defendant entered a plea agreement with the United States, and agreed, *inter alia*, to plead guilty to Count Five of the Superseding Indictment charging him with an extortionate collection of credit conspiracy, a violation of 18 U.S.C. § 894(a); and

WHEREAS, the defendant, as part of his plea agreement with the United States, has agreed to the entry of an Order of Forfeiture against him in the amount of Forty Five Thousand Dollars ($45,000) (the "Forfeiture Money Judgment") as property constituting or derived from, any proceeds traceable to the extortionate collection of credit conspiracy and/or substitute assets.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.    The defendant shall forfeit to the United States the full amount of the Forfeiture Money Judgment pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), 21 U.S.C. § 853(p), and Fed. R. Crim. P. 32.2.

2.    The defendant shall remain fully liable to pay the entire Forfeiture Money Judgment to the United States.

3.    The defendant shall fully assist the Government in effectuating payment of the Forfeiture Money Judgment.

4.    The defendant shall not file or interpose any claim or assist others to file or interpose any claim to any property against which the Government seeks to execute the Forfeiture Money Judgment.

5.    Until the Forfeiture Money Judgment is satisfied, the defendant shall not, directly or indirectly, engage in any effort to transfer, sell, assign, pledge, hypothecate, encumber or dispose of in any manner, or cause to be transferred, sold,

3

assigned, hypothecated, encumbered, or disposed of in any manner
any of the forfeited property or substitute assets.

6.  In partial satisfaction of the Forfeiture Money
Judgment, pursuant to the terms of the plea agreement and based
on the defendant's Financial Statement, the defendant shall
forfeit to the United States all his right, title and interest in
the following assets (collectively "the IRA and the Seized
Currency"):

(a) an IRA Account No. 7700074998, with
Metropolitan Life Insurance Company, held in name of or for the
benefit of Richard R. Lotito (SS # xxx-xx-5217), with a value, as
of October 21, 2010, in the amount of at least $46,844.46; and

(b) the $3,079 in U.S. currency seized by law
enforcement from the defendant at the time of his arrest on
October 7, 2008. 2009

The United States shall proceed to seize and forfeit
the IRA.  If and when remitted to the United States, the net
proceeds of the liquidation of such assets shall be credited
towards the Forfeiture Money Judgment.

7.  The Government may also execute the Forfeiture
Money Judgment upon any other assets of the defendant, up to the
outstanding balance, pursuant to 21 U.S.C. § 853(p), the Federal
Debt Collection Procedure Act, or any other applicable law.

8.  All payments, by the defendant or any financial

4

institution served with a copy of this Order, towards the

Forfeiture Money Judgment shall be made by bank or certified

check(s) payable to the "United States Marshals Service."

The defendant or financial institution shall cause said checks to

be sent by overnight mail to the United States Attorney's Office,

Eastern District of New York, 271 Cadman Plaza East, 7th Floor,

Brooklyn, New York, 11021, Att: Claire S. Kedeshian, Assistant

U.S. Attorney, with the criminal docket number noted on the face

of the checks.

9.    Pursuant to Rule 32.2(b)(6), the United States

shall publish notice of this Order, in accordance with the custom

and practice in this district, on the government website

www.forfeiture.gov, and of its intent to dispose of the IRA and

Seized Currency in such a manner as the Attorney General or his

designee may direct.  The United States may, to the extent

practicable, provide direct written notice to any person known or

alleged to have an interest in the IRA and Seized Currency as a

substitute for published notice as to those persons so notified.

10.    Any person, other than the Defendant, asserting a

legal interest in the IRA and Seized Currency may, within thirty

(30) days of the final publication of notice or receipt of

notice, whichever is earlier, petition the court for a hearing

without a jury to adjudicate the validity of his or her alleged

interest in the property, and for an amendment of the order of

5

forfeiture, pursuant to 21 U.S.C. § 853(n)(6). Any petition

filed in response to notice of the forfeiture of the IRA and

Seized Currency must be signed by the petitioner under penalty of

perjury and shall set forth the nature and extent of the

petitioner's right, title, or interest in the property, the time

and circumstances of the petitioner's acquisition of the right,

title, or interest in the property, any additional facts

supporting the petitioner's claim, and the relief sought.

11.   The defendant knowingly and voluntarily waives his

right to any required notice concerning the forfeiture of monies

hereunder.  The defendant further knowingly and voluntarily

waives his right, if any, to a jury trial on the forfeiture and

waives any and all defenses to the forfeiture set forth herein,

including, but not limited to defenses based on double jeopardy,

the ex post facto application of any applicable statutes, any

applicable statute of limitations, or the Excessive Fines Clause

of the Eighth Amendment.

12.   The terms contained herein shall be final and

binding upon the Court's "so ordering" of this Order.

13.   Pursuant to Fed. R. Crim. P. 32.2(b)(4), this

Preliminary Order of Forfeiture shall be final as to the

defendant at the time of sentencing and shall be made a part of

the sentence and included in the judgment.  This Order shall be

binding on the defendant and his successors, administrators,

6

heirs, assigns, and/or transferees and shall survive the
bankruptcy of any of them.

        14.  The United States alone shall hold title to the
monies paid by the defendant to satisfy the Forfeiture Money
Judgment and shall hold clear title to the IRA and Seized
Currency if no claims are filed within the time permitted by
statute.

        15.  The Court shall retain jurisdiction over this
action to enforce compliance with the terms of this Order.

        16.  The Clerk of Court is directed to send, by
interoffice mail, three certified copies of this executed Order
to the U.S. Attorney's Office, Eastern District of New York Att:
Claire S. Kedeshian, Assistant U.S. Attorney.

Brooklyn, New York            SO ORDERED:
Dated: January  , 2011


                              _____
                              HONORABLE NICHOLAS G. GARAUFIS
                              UNITED STATES DISTRICT JUDGE
                              EASTERN DISTRICT OF NEW YORK

EXHIBIT "F"

To Honorable Nicholas G. Garaufis

Dear Sir:

My name is Diondra Lotito and I am the daughter of Richard Lotito. My father is a very important aspect in my life and I love him very much. I love and admire my father very much and as I've gotten older I have realized how lucky I am to have a father like him. Over the years I have met many of my friends father's and I have learned that my father is one of the most amazing men that I have ever met. He puts my sister and me before everything else in his life and always goes above and beyond for us. After I went away to college I realized how much he really does for me and how hard it was to be away from him. What I love most about my dad is how generous he is. He is always helping his friends and family when they need him. I always call my father the "Mayor of Staten Island" because every time I go somewhere with him we run into some one he is friends with and many of these people always tell me how much they love my father and what a great guy he is. I believe that these people love my father so much because of how generous and caring he is and they know that they can always depend on my dad. I know that my father may have committed a crime but from being with him every day I truly know that he is not a bad person. I also know that my dad must be punished for committing these crimes but I hate to think that he will be away from my family for so long. My sister and I are both very scared for my father and do not know what will happen to him. Being away from him is going to be the hardest time of our lives but we understand that it must happen. I just hope that the court understands that he is a very important part of many people's lives and does not deserve to be away from the people that love him for so long.

Sincerely,
Diondra Lotito

To Honorable Nicholas G. Garaufis

Dear Sir:

     Everyone has a best friend. Someone who is there for them whenever they need them. Someone who they can tell anything to. A best friend is someone that will never leave your side and will do anything to make you smile. My best friend is my daddy. My dad is the most amazing person I know. Whenever he walks into a room, his goal is always to make everyone else in that room smile, laugh, and have a good time; and he always succeeds in that. My father and I spend the most time together out of anyone in our family. Everyday he picks me up from school and is always the first person to realize if something bothered me that day. After he picks me up from school he brings my friends and I out for lunch wherever we want to go. Then, when we are done eating we drive home jamming out to the radio in his car. All of my friends know my dad and every single one of them thinks he is a great man. They tell me all the time how lucky I am to have such a cool dad. My dad is the type of person who will do anything for his family. He will buy us the closest seats possible for our favorite concerts, he will drop everything he is doing if my sister or I need him, and he did everything he could to make my Fabulous 15 and my sisters Sweet 16 absolutely perfect for us. One of my favorite things about my dad is his dancing. Whenever we go to a family party, you will always find my dad and I doing the hustle on the dance floor. I also love how whenever I don't feel good, all I have to do is go sit on my dads lap, give him a hug, and I know I will instantly feel better. One of my favorite memories of my dad is when we went to work on his Ralph's ice trucks together. He would always pay me in presents. Not only is my dad my father and best friend, but he is also my biggest fan. He is at every single St. Joseph by the Sea Vikings volleyball game wearing a Viking hat in the crowd cheering me on. He goes to every one of my dance recitals and dance competitions. He recently told me no matter what score I get from a judge, I will always be a high gold to him. I am aware that my father has done something wrong. I do not understand what it is about though. Even though what he did was not right, it doesn't mean that he is a bad person. He is still the amazing father/person he has been for the last 15 years of my life and I will always love him no matter what.

                    Sincerely,
                    Dominique Lotito

May 25, 2011

To Honorable Nicholas G. Garaufis

Dear Sir:

I feel that it's important that I write you a letter regarding the character of Richard Lotito because I feel I know him the best. My name is Michele Lotito and I was married to Richard for 20 years, we dated for 6 years prior to that and we were best friends for 2 years before that. At this point, I have his last name longer than I had my maiden name. For 3 decades Richie was the center of my world, and the most important part of my life along with our 2 children. When we met as teenagers in high school we immediately became best friends. I soon learned that even though we came from different backgrounds we had the same values and goals in life. Once I got to know him intimately, I knew this was the man I wanted to spend the rest of my life with. He is a kind, honest, loving, caring, and generous man. Over the years I have seen him help so many people less fortunate then him. He's always looking to help the underdog. He had a very poor, but happy and loving childhoold. That's what made him such a giving and loving father and husband. He always treated me well and is a wonderful father. He does everything for his children, and is always there for them when they need him. He picks them up from school so they get to spend quality time together while I'm at work. He takes them to eat, to the gym, gets to know their friends, and is very involved in their lives, their schoolwork, and their after school activities and sports. He is such a huge part of their lives and they look up to and admire him so much.They are going to be lost and devestated without him around and he will feel the same way without them. They understand what's going on and it's a very tramatizing and scary time for them. I hope that you will consider that this affects the children greatly. We all feel that the court is being harsh on him for the crime that he may have committed. He has even said that he knows he has to be punished but he doesn't deserve to be away from his family for so long. He and the children will miss out on so many things together and he will be greatly missed by so many people. Even though we seperated from each other 3 years ago, I still feel he is an extremely honorable man. He is a loyal friend, and an involved and concerned parent. I am very worried about his health and how he will manage his diabetes, and I hope this stress does not affect him and shorten his life. Even though we are no longer together, my family is also very upset over this and concerned about him. My mother still thinks of him as a son, my sister thinks of him as a brother because they remember all of the good things he's done for them over the years. I'm glad he and I have a good relationship today because I still need him in my life in some way. People ask me why am I still so nice to him and I say because I haven't forgotten all of the good things he has done for me in the past years either. No matter what happened between us, the good definitely outways the bad, that's why I'm wishing the best for him, and hoping you'll be lienient on him. Thank you.

Sincerely yours,

*Michele Lotito*

Michele Lotito

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza Ease
Brooklyn, New York 11201

Dear Honorable Judge,

My name is Richard Lotito, the Father of Richard Lotito. I am a retired iron worker. I was disabled in 1973 when I fell off a building. I have been on social security since the accident.

My son has been very helpful in aiding me by taking me to my doctor appointments as I have a heart condition. He has also been very emotionally supportive to me since the death of my wife in 2004.

As many people have made mistakes in their lives, my son is no exception. Yet, he has always been a loving caring human being that has helped me through some of my life's toughest times. He is a doting father, a supportive brother and most of all a loving son.

I would like to ask leniency with my son as I so not know how I will be able to continue without his support.


Sincerely,

*Richard Lotito*

Richard Lotito

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201


Dear Honorable Judge,

My name is Michelle Lotito, I am the sister of Richard Lotito.  I am a hair dresser and work for Hair Club for Men for the last 10 years.  Richard Lotito and I have been very close for the 45 years of my life.  We have always been a very close family as adults and also children.  I'm always with my brother and his family which he has 2 beautiful girls that I am also extremely close with.  I understand that he has been convicted of a crime, but he is a very loving, supporting, and a true friend and brother to me.  He was my rock when our mother passed away seven years ago.  We all were very close with her and devastated with her sudden passing. I thought I would never function or pull myself together and my brother Richard pulled me back up and helped me through the worst time of my life. I don't think I would have been able to do that without him.  Not only is he a great person to me but his two daughters have a relationship with him that I have never seen a dad have with their daughters.  I truly need my brother in my life because it just wouldn't be right not seeing him or being with him all the time.


Sincerely,

Michelle Lotito